**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | ) No. CR 09-1040-PHX-MHM |
| Plaintiff, | ) **ORDER** |
| vs. | ) |
| Shavor K. Simpson, et al., | ) |
| Defendants. | ) |

Currently before the court is Defendant Alexander's Motion to Dismiss Indictment for Outrageous Government Conduct (Dkt.#110). This motion was joined by Defendants Angel Mahon (Dkt.#120), Cordae L. Black (Dkt.#131), Terrance L. Timmons (Dkt.#139), and Aaron D. Marsh (Dkt.#145). Defendant Holden also filed a separate Motion to Dismiss Indictment for Outrageous Government Conduct (Dkt.#134), which was also joined by Defendants Alexander (Dkt.#136), Mahon (Dkt.#128), Timmons (Dkt.#124), Marsh (Dkt.#145), and Black (Dkt.#159). Having considered these motions and their accompanying papers, evidence presented at the evidentiary hearings held on March 17, 23 and April 7, 2010, as well as oral argument regarding the same, the Court issues the following order.[1]

---

[1] This Order does not address any affirmative defenses that will be presented to the jury such as entrapment.

# I.    Factual Background

It is undisputed that Phoenix has had a serious problem with home invasions and kidnappings.  It has been called the "'kidnap-for-ransom capital' of the U.S."  Michael Ferraresi and J.J. Hensley, Police Battle Wave of Abductions, Arizona Republic, Feb. 15, 2009 (attached as Exhibit A to the Government's Response Brief, Dkt.#128).  Agent Zayas, an undercover agent who specializes in infiltrating drug deals and gangs, testified that many home invasions are related to drug deals, with rival gangs stealing from competitors, and that these crimes are rarely reported.  He also explained the inherent difficulties of locating and arresting the individuals engaged in such activities.  Even when police are aware of such activities, attempting to arrest one gang in the act of robbing another gang may seriously endanger the neighboring communities given the possibility that a shoot-out will occur and hostages will be taken.  Because of these difficulties, Agent Zayas explained that police have come to utilize reverse-sting operations to catch would-be home invaders, wherein participants believe they are about to rob a stash house, but are themselves arrested instead.

Agent Zayas devised such a plan to pose as a disgruntled drug courier who desired a crew to help him steal the drugs he was supposed to transport.  This plan allowed him to create certain parameters around the hypothetical stash house robbery.  First, the robbery would have to occur in daylight because he would claim not to know the location of the drugs until he received a call around noon.  Next, he would tell the would-be home invaders that the stash house was guarded by two armed men.  These factors were designed to ensure that the hypothetical robbery involved a high level of potential violence so that only "hard core" home invaders who were undeterred by such violence would get "caught" in the plan.  Agent Zayas testified that a number of individuals to whom he had previously presented the plan had dropped out after hearing that the robbery would have to occur in broad daylight, and that the drugs were guarded by two armed individuals.  The fact that he had to await the phone call and had a limited time to pick up the drugs would ensure that they would not kidnap him and force him to tell them where the stash house was so that they could rob it by night.  Agent Zayas testified that after he presented this plan to his superiors at the Bureau

of Alcohol, Tobacco, Firearms and Explosives, they accepted it and sent him to Phoenix to carry it out.

Agent Zayas testified that as part of his plan to infiltrate would-be home invaders, he arranged for a confidential police informant to make contact with home-invasion crews and introduce them to him. While at a bar in the Phoenix area, the confidential informant struck up a conversation with an individual named Curtis. The confidential informant told Curtis that he was interested in finding weapons and referenced a robbery. He cryptically asked Curtis if he knew anyone who would be interested in committing such a robbery. Curtis gave the confidential informant Defendant Simpson's contact information. The confidential informant called Simpson and arranged to meet him. At the meeting, the confidential informant told Simpson that he had a Cuban friend that had some information on a house "possibly with some dope in it" and asked Simpson if he would be interested in putting a crew together. Simpson said yes, so the confidential informant arranged for Simpson to meet Agent Zayas.

On July 16, 2009, Defendant Simpson met with the confidential informant and Agent Zayas, who explained that he was disgruntled because he had not been adequately paid for his work as a drug courier.[2] Agent Zayas also said that there might be up to 46 kilograms of cocaine in the stash house and that it was guarded by two armed men. Simpson said that he had a crew, that he had done this before, and began to plan the invasion. Simpson at one point asked how many men would be required, and the agent replied, "Dude, I don't know. I'm serious this is your gig, you tell me, you know what I'm saying. . . ." (Exh. 7 at 7) Simpson replied that he was going to need "at least five dudes" (Exh. 7 at 7) and came up with a plan that included the use of five men, the use of firearms, and killing any member of the crew that informed the government.

---

[2] This meeting, as well as most of the subsequent meetings, were secretly recorded by the government and were viewed by the Court at the evidentiary hearings.

While testifying at the evidentiary hearing, Agent Zayas explained that he was careful not to suggest a particular number of men or a specific plan to Simpson, but to let Simpson come up with the plan on his own. He also explained that he intentionally told Simpson that the stash house would need to be robbed during daylight, while it was guarded by up to two armed men in order to require a heightened degree of violence in the robbery. Agent Zayas also explained that occasionally, targeted individuals would drop out when they realized that the robbery had a relatively high likelihood of turning violent.

Simpson made plans to meet with Agent Zayas again on July 26. This time, Simpson brought co-defendant Black and introduced him as his "right hand soldier." Black did most of the talking during this conversation and suggested that one possible means of accomplishing their objective was to take a hostage. Simpson and Black then went to meet with Defendant Alexander, who Simpson claimed had organized a crew, had committed five previous home invasions, and had firearms.

On July 27, Agent Zayas and the undercover agent met with Defendants Alexander, Simpson, Black, Mahon and Marsh. Defendant Alexander led the meeting. Agent Zayas explained that he was supposed to pick up six to eight kilograms of cocaine at an armed stash house that would contain an additional 22-39 kilograms of cocaine. When Agent Zayas expressed concerns about their safety, Defendant Alexander said, "We gonna get guns up in that house, you ain't got to trip on that." (Exh. 10 at 4) When Defendant Alexander later questioned the motives of Agent Zayas, Zayas reminded them that he wanted an even share of the cocaine. Agent Zayas asked Alexander whether he felt good about it. Defendant Alexander replied that he did.

According to Simpson, later that evening Defendants Alexander, Simpson, Timmons, Black, Mahon, Marsh and Holden met at a friend's home and discussed the mechanics of forcibly taking the cocaine. Neither Agent Zayas nor the confidential informant were present. There were approximately 14 people present, and Defendant Alexander selected the six individuals who would commit the home invasion. This meeting lasted into the morning of July 28, 2009.

On July 28, 2009, just before carrying out the plan to invade the armed stash house, the Defendants met again. Defendant Holden was the driver of one car, with Defendants Mahon and Marsh as passengers. Defendant Timmons was the driver of the other car with Defendants Alexander and Black as passengers. Defendant Simpson was not present, and at the evidentiary hearing, he testified that he had become suspicious and had decided not to participate. Both cars arrived at the prearranged location to meet with Agent Zayas. Agent Zayas realized that Defendant Timmons had not been present at a previous meeting and asked who Timmons was. Defendant Alexander testified, "He's my driver, man." Agent Zayas explained that there were going to be "like fifty keys" of cocaine. Agent Zayas then said to Timmons, "Just don't put a bullet in my head." Agent Zayas also approached the second car which contained Defendants Holden, Mahon, and Marsh. He asked, "everybody knows what they're doing, right, I just want to feel comfortable with you, because this guy can call me at any minute now, everything cool?" No individual responded negatively. Agent Zayas then asked them to follow him to a storage unit where they would put his share of the cocaine after the robbery.

The Defendants followed Agent Zayas to the storage facility, where they were all arrested. A total of six men and two cars with four loaded firearms were seized at the arrest site. At the evidentiary hearing, Simpson testified he was arrested in October 2009 for an unrelated crime and that he offered to cooperate with the police regarding the reverse stash house-sting in order to get reduced charges in the other crime.

Defendant Alexander initially moved to dismiss based on outrageous government conduct. (Dkt.#110) His motion was joined by Defendants Mahon (Dkt.#120), Black (Dkt.#131), Timmons (Dkt.#139), and Marsh (Dkt.#145). The Government responded to this motion. (Dkt.#128). No reply was filed; however, Defendant Holden addressed the arguments raised by the Government in his separate Motion to Dismiss Indictment for Outrageous Government Conduct (Dkt.#134), which was also joined by Defendants Alexander (Dkt.#136), Mahon (Dkt.#128), Timmons (Dkt.#124), Marsh (Dkt.#145), and

1  Black (Dkt.#159). The Government filed a Response to this second Motion to Dismiss for

2  Outrageous Government Conduct (Dkt.#164).[3]

3  **II.    Analysis**

4         "Outrageous government conduct is not a defense, but rather a claim that government

5  conduct in securing an indictment was so shocking to due process values that the indictment

6  must be dismissed." United States v. Williams, 547 F.3d 1187, 1199 (9th Cir. 2008). This

7  is an "extremely high standard," and must be "shocking to the universal sense of justice

8  mandated by the Due Process clause of the Fifth Amendment." United States v. Smith, 924

9  F.2d 889, 897 (9th Cir. 1991); Williams, 547 F.3d at 1199. "This standard is met when 'the

10 government engineers and directs a criminal enterprise from start to finish,' but is not met

11 'when the government merely infiltrates an existing organization, approaches persons it

12 believes to be already engaged in or planning to participate in the conspiracy, or provides

13 valuable or necessary items to the venture.'" Williams, 547 F.3d at 1199 (quoting United

14 States v. Gurolla, 333 F.3d 944, 950 (9th Cir. 2003)). Outrageous government conduct is not

15 a question of fact for the jury, but a question of law for the Court. U.S. v. Citro, 842 F.2d

16 1149, 1152 (9th Cir. 1988).

17         **A.    Standing**

18         The government argues that no Defendant besides Simpson has standing to bring the

19 motion to dismiss, because only Simpson was directly recruited by the undercover agent.

20 Simpson (not the agent) recruited the rest of the Defendants.[4] (Dkt#164) The government

21 contends that only Simpson was the "target" of the investigation. (Dkt. #164 at 3)

22         Defendants respond by arguing that the true "target" of the investigation was not

23 merely Simpson, but the entire crew. (Dkt.#166 at 3-4) Defendants cite to the government's

24

25         [3] For simplicity's sake, this Order will address Defendants' arguments collectively,
   rather than explaining in every instance precisely which Defendant initially raised each
26 argument and which Defendants later joined the argument.

27         [4] However, Simpson has not joined any of the motions to dismiss for outrageous
28 government conduct.

prior response, which stated that "[i]n 2009, as part of the [BATF] undercover sting operation into violent home invasion *crews*, an ATF confidential informant (CI) and undercover agent (U/C) began infiltrating a *criminal community* that gathered at various locations in Phoenix, Arizona. The CI was to make contact with the home invasion *crews*, who he would introduce to the U/C." (Dkt.#134 at 2; Dkt.#128 at 2) Defendants contend that if the entire crew was targeted, the entire crew should have standing. (Dkt.#134)

The Ninth Circuit initially opined that individuals who are "targets" of governmental activity have standing to assert an outrageous government conduct claim. United States v. Bogart, 783 F.2d 1428, 1433 (9th Cir. 1986) ("Bogart was the target of the government's activity here. He, therefore, has standing to contest his conviction on the grounds that the government's conduct was so outrageous that it violated his due process rights."). In the same case, the Ninth Circuit explained that co-defendants do *not* have standing to challenge outrageous government aimed at someone else: "Neither Wingender nor Risquez . . . were the targets of the government's conduct. A defendant does not have standing to raise a due process violation suffered by a third party." When Bogart's co-defendant Wingender later filed a petition for rehearing in which he asserted that he had also been independently targeted by the government (and thus would have standing to raise the outrageous government conduct claim), the panel vacated its opinion and remanded the case to the District Court to examine whether he was indeed targeted. United States v. Wingender, 790 F.2d 802 (9th Cir. 1986). Thus, it appears that the proper test for standing to assert an outrageous government conduct claim is whether the defendant was "targeted," (not necessarily directly contacted) by the government. See also United States v. Emmert, 829 F.2d 805, 811-12 (9th Cir. 1987) (noting that one defendant "lack[ed] standing to object to the government activities . . . since he was never an actual target of the investigation"); Williams, 547 F.3d at 199 n.10 (explaining that "only defendants to whom the government's conduct is directed have standing to raise an outrageous government conduct claim" and "assuming without deciding" that two of the defendants in question had standing to raise it) (citing Bogart, 783 F.2d 1428, 1433 (9th Cir. 1986)).

At the evidentiary hearing, Agent Zayas testified that the goal of the undercover sting operation was to take down a *crew* of individuals associated with home invasions. Moreover, even if each member of the crew was not specifically individually targeted prior to the operation, it appears that they later became collateral "targets" as the investigation proceeded. Emmert, 829 F.2d at 811-12 (illustrating the principle that individuals not initially targeted may nevertheless later become targets; "Emmert was not initially a target of the investigation, but became a target when Powell introduced him to Mosteller and Vasquez."). These facts, when taken in conjunction with the government's concession that the sting operation's purpose was to "infiltrat[e] a criminal *community*" and contact "home invasion *crews*,"(Dkt.#128 at 2) make it clear that defendants were targeted as a group, even if the government directly recruited only Simpson, with Simpson recruiting the others. Because Defendants were "targeted" as a group, it appears that all of them have standing to raise the outrageous government conduct defense. The Court will therefore address the merits of the question.

### B. The Merits

Defendants argue that the Government's conduct was so outrageous that the indictments against them must be dismissed. (Dkts.#110, 134) In essence, they argue that the government "lured" them into committing a fictitious crime involving a fictitious quantity of drugs when they were not suspected (or even identified) of being involved in any prior similar crimes. (Dkts.#110, 134) They also argue that rather than infiltrating an existing organization, the government actually created a new organization for the purpose of robbing the fictitious stash house. (Dkts.#110, 134) These arguments will be addressed below; however, this Order will first review the law generally regarding outrageous government conduct.

### (1) General Theory Regarding Outrageous Government Conduct

"To secure the dismissal of an indictment on due process grounds, 'a defendant must meet an extremely high standard.'" United States v. Nobari, 574 F.3d 1065, 1081 (9th Cir. 2009) (quoting United States v. Smith, 924 F.2d 889, 897 (9th Cir.1991)). "This defense

[outrageous government conduct] will not succeed unless the governmental conduct challenged is so grossly shocking as to violate the universal sense of justice." United States v. Bonanno, 852 F.2d 434, 437 (9th Cir. 1988).

Defining precisely what government conduct qualifies as "outrageous" is admittedly difficult. As the Ninth Circuit explained, "[d]rawing a bright line [of what constitutes outrageous government conduct and what does not] with any degree of assurance is fraught with problems. The point of division at the margins between police conduct that is just acceptable and that which goes a fraction too far probably cannot be usefully defined in the abstract. Ultimately, every case must be resolved on its own particular facts." Bogart, 783 F.2d 1428, 1428 (9th Cir. 1986). The decision ultimately turns on the totality of the circumstances and the individual case facts. Id. When police conduct is so outrageous that it "shocks the conscience," it is considered to be constitutionally unacceptable. Id. For a finding of outrageous government conduct, "the Government's involvement must be *malum in se* or amount to the engineering and direction of the criminal enterprise from start to finish." Smith, 924 F.2d at 897.

### (a)    Example of Outrageous Government Conduct

"It appears that the successful assertion of the outrageous government conduct defense is extremely rare." United States v. Wong, 1996 WL 225008 at *5 (N.D. Cal. April 29, 1996); United States v. Ryan, 548 F.3d 782, 789 (9th Cir. 1976) (explaining that "the due process channel which Russell [United States v. Russell, 411 U.S. 423 (1973)] kept open is a most narrow one"). It appears that the defense has only been raised successfully once in the Ninth Circuit, in Greene v. United States, 454 F.2d 783 (9th Cir. 1971). In Greene, the panel reversed conspiracy and bootlegging convictions on the grounds that the government's sting operation constituted outrageous government conduct. Apparently, government undercover agents had helped to re-establish and sustain the bootlegging operations that had been shut down as a result of prior convictions. Government involvement lasted over three years, agents provided materials for the still, and employed veiled threats to convince Greene to keep the still running. Moreover, the undercover agent was the still's sole customer. The

Ninth Circuit held that such actions were unacceptable, and <u>Greene</u> appears to be the only example of outrageous government conduct within this Circuit.

### (b) Examples of Non-Outrageous Government Conduct

In contrast, the Ninth Circuit has quite frequently found that the government conduct in question was *not* outrageous. As summarized in an unpublished Ninth Circuit decision, <u>United States v. Wegman</u>, 917 F.3d 1307, 1990 WL 170409 at *4 n.1 (9th Cir. Nov. 6, 1990), the following cases are examples of conduct that was deemed acceptable: <u>United States v. Luttrell</u>, 889 F.2d 806, 811-14 (9th Cir. 1989) (counterfeit credit card sting operation not outrageous government conduct); <u>United States v. Slaughter</u>, 891 F.2d 691, 695-6 (9th Cir. 1989) (government use of informant to strike up personal relationship with defendant and persuade him to sell cocaine not outrageous conduct); <u>United States v. Bonnano</u>, 852 F.2d 434, 437-8 (9th Cir. 1988) (FBI informant posing as potential investor in fraudulent scheme did not constitute outrageous government conduct); <u>United States v. Citro</u>, 842 F.2d 1149, 1152-3 (9th Cir. 1988) (counterfeit credit card sting operation not outrageous government conduct); <u>United States v. Simpson</u>, 813 F.2d 1462, 1464-1471 (9th Cir. 1987) (FBI manipulating woman into providing sexual favors to lure target into selling heroin not outrageous conduct); <u>United States v. Emmert</u>, 829 F.2d 805 (9th Cir. 1987) (FBI approaching college student and offering $200,000 finder's fee for securing cocaine supply for government agent not outrageous conduct); <u>Shaw v. Winters</u>, 796 F.2d 1124, 1125-6 (9th Cir. 1986) (food stamp sting operation not outrageous government conduct); <u>United States v. Wiley</u>, 794 F.2d 514, 515-6 (9th Cir. 1986) (government activation of scheme to smuggle drugs into prison not outrageous conduct); <u>United States v. Williams</u>, 791 F.2d 1383, 1386-7 (9th Cir. 1986) (prison authorities prior knowledge of escape plans not outrageous conduct); <u>United States v. Driscoll</u>, 853 F.2d 84, 85-87 (3d Cir. 1988) (child pornography sting operation not outrageous government conduct); <u>United States v. Musslyn</u>, 865 F.2d 945, 946-947 (8th Cir. 1989) (child pornography sting operation not outrageous government conduct). As these cases illustrate, several instances of "questionable" government behavior has been deemed to fall short of "outrageous" government conduct.

The facts of one case in particular, <u>Slaughter</u>, 891 F.2d 691, demonstrate that less-than-exemplary government behavior does not necessarily translate into a successful "outrageous government conduct" defense. Slaughter was a 54-year old divorcée who worked as a polygraph examiner. He was suspected of having "fixed" a number of tests to pass individuals even when they were lying. He had also been suspected of using and distributing cocaine for several years, but because of his involvement with the law enforcement community, it was difficult for any agency to investigate these rumors. When a "very attractive young lady" who was working as an undercover informant (and who was 24 years old) moved to town, the FBI used her to lure Slaughter into a number of compromising situations. The FBI instructed her to ask Slaughter if she could buy cocaine from him. He responded "no" on eleven separate occasions. She persisted, however, and eventually, Slaughter sold her a gram of cocaine for $200. Before this exchange took place, she discussed the possibility of moving in with him, and "[o]ther provacative and sexually explicit topics were also discussed." 891 F.2d at 694 n.1. A few days later, he sold her some more cocaine. He was ultimately convicted of two counts of distribution of a controlled substance.

In affirming the District Court's finding of no outrageous government conduct, the Ninth Circuit explained that "[g]overnment agents may lawfully use methods that are neither appealing nor moral if judged by abstract norms of decency." 891 F.2d at 696. The Court explained that the government's conduct in using an attractive female "to attempt to strike up a 'personal' relationship with Slaughter" was "unfortunate," but "not legally impermissible." <u>Id.</u> The Court emphasized that "[a]n indictment should be dismissed for outrageous government conduct only where the government's conduct is 'so grossly shocking and so outrageous as to violate the universal sense of justice.'" <u>Id.</u> at 695 (quoting <u>Citro</u>, 842 F.2d at 1152).

Similarly, in <u>Simpson</u>, 813 F.2d 1462, the FBI employed a known prostitute, Helen Miller, to investigate Darrel Simpson (a suspected heroin dealer).[5]  She and a fellow informant, Karen Eccles, posed as stranded travelers at an airport and persuaded Darrel to give them a ride into town.  They ended up at Darrel's apartment where Miller and Darrel became sexually intimate.  Miller later introduced Darrel to "friends" (undercover FBI agents) who were interested in purchasing heroin.  After the deal went down, Darrel was arrested.

The District Court dismissed the indictment against Darrel, explaining that the following conduct, when taken as a whole, was outrageous: "first, 'the Government's manipulation of Helen Miller into becoming an informant;' second, 'the Government's continued employment of Miller despite her known status as a heroin addict and prostitute, and despite her numerous arrests;' and third, 'the Government's continued use of Miller as an informant after learning of her sexual involvement with Darrel Simpson.'"  813 F.2d at 1464.

The Ninth Circuit reversed, explaining that "the outrageous conduct doctrine bars prosecution of defendants in 'that slim category of cases in which the police have been brutal, employing physical or psychological coercion against the defendant.'"  813 F.2d at 1465 (quoting <u>Bogart</u>, 783 F.2d at 1435).  Because there was no evidence that Darrel was "physically or psychologically coerced into developing a close relationship with Miller," the Court found that there was no due process violation, explaining that "[t]he due process clause does not protect [Darrel] from voluntarily reposing his trust in one who turns out to be unworthy of it."  813 F.2d at 1466.  The Court recognized that "many people in our society may find the deceptive use of sex in law enforcement to be morally offensive."  <u>Id.</u> at 1468.  However, the Court explained that "[n]onetheless, 'in order to apprehend those engaged in

_____

[5] Darrel Simpson will be hereafter referred to as "Darrel" in order to avoid confusion with Shavor K. Simpson, the Defendant in this case.

serious crime, government agents may lawfully use methods that are neither appealing nor moral if judged by abstract norms of decency.'" <u>Id.</u> (quoting <u>Bogart</u>, 783 F.2d at 1438).

As <u>Slaughter</u> and <u>Simpson</u> demonstrate, the government's virtue or vice is not the relevant inquiry when analyzing outrageous government conduct; instead, the focus is on whether the government's behavior was so grossly shocking that any other outcome except for dismissal would be unacceptable.

### (c) The Five-Factor <u>Bonanno</u> Test

<u>Williams</u> explained that the Ninth Circuit has "set forth five factors that, when satisfied, indicate that governmental conduct was acceptable:

> (1) the defendant was already involved in a continuing series of similar crimes, or the charged criminal enterprise was already in process at the time the government agent became involved; (2) the agent's participation was not necessary to enable the defendants to continue the criminal activity; (3) the agent used artifice and stratagem to ferret out criminal activity; (4) the agent infiltrated a criminal organization; and (5) the agent approached persons already contemplating or engaged in criminal activity."

<u>Williams</u>, 547 F.3d at 1199-2000 (quoting <u>Bonanno</u>, 852 F.2d 434). The five factors appear to function more like a balancing test than a *sine qua non* checklist of absolute requirements for government behavior to be acceptable. For example, it is difficult to reconcile how an agent's failure to use artifice and stratagem in ferreting out criminal activity (factor 3) would mean that the government's conduct was "therefore" outrageous. However, this is what Defendants' interpretation of the five-factor list assumes: Defendants argue that "the government *must* satisfy a five-factor test before the conduct can be deemed acceptable," and "[f]or law enforcement's actions to be successful in the face of a claim of outrageous government conduct, its actions *must comport with* five factors." (Dkt.#110 at 4; Dkt. #134 at 7) However, as explained above, analysis regarding outrageous government conduct is a totality of the circumstances test, and the nonexistence of one of the five factors, while informative, does not dictate that the government's conduct was outrageous. <u>See</u> <u>United States v. Gurolla</u>, 333 F.3d 944, 950-51 (9th Cir. 2003) (finding no outrageous government

conduct while addressing only the first of the five factors).[6]  The test in <u>Williams</u> does not

say if, *and only if,* the five <u>Bonanno</u> factors are met, the government conduct is acceptable.

Rather, it appears the factors are guidelines that provide a means to analyze the government's

behavior.  To conclude that the government's conduct was unacceptable, or "outrageous" if

one of the factors is not met would require a strict application of the factors in every instance

of questioned government conduct.  However, outrageous government conduct is to be

analyzed by considering the totality of the circumstances in each case.  <u>Bogart</u>, 783 F. 2d at

1428.

### (d)    Application of the Five-Factor <u>Bonanno</u> Test

Each factor is discussed at length below.

> **(1)    The defendant was already involved in a continuing series of similar crimes, or the charged criminal enterprise was already in process at the time the government agent became involved**

Defendants argue that there was no evidence that anyone had already committed any

crime, let alone a similar crime, at the time the government became involved.  (Dkt.#110)

Defendants focused on the confidential informant's testimony and his statements that he did

not have any reason to suspect any of the Defendants until he began chatting with "Curtis."

At the evidentiary hearing, the confidential informant testified that he went to a bar

"in the bad part of town" where the informant testified there was "a lot of criminal activity."

At this bar, the confidential informant testified that he asked Curtis if Curtis would be willing

---

[6] <u>Gurolla</u>, 333 F.3d 944, involved an undercover money laundering sting that targeted Mexican banks that were believed to launder money for various drug cartels.  A confidential informant met with a low-level money launderer for the Cali cartel.  The confidential informant agreed to provide the money to be laundered, and the money launderer agreed to provide the bankers.  Ultimately, a number of individuals were convicted of money laundering.  In analyzing the outrageous government conduct defense, the Ninth Circuit only discussed the first <u>Bonanno</u> factor: "Because the government did not initiate the criminal activity, but rather sought to crack an ongoing operation, its conduct was not outrageous and did not violate due process."  333 F.3d at 950.  Although <u>Gurolla</u> was decided in 2003, well after <u>Bonanno</u>, the Court never discussed the remaining factors (and indeed, did not even specifically identify the first factor as one of the five <u>Bonanno</u> factors).

to sell him some guns or participate in illegal activity, possibly a robbery. Curtis said no, so the confidential informant asked Curtis if he knew someone who would. Curtis told the confidential informant that "Bullet" (Simpson's "street" name) would do it. Curtis gave the confidential informant Simpson's number and showed him where Simpson lived. Then the confidential informant called Simpson and arranged to meet him. At the meeting, the confidential informant told him that he had a Cuban friend that had some information on a house "possibly with some dope in it" and asked Simpson if he would be interested in putting a crew together. Simpson said yes, so the confidential informant arranged for Simpson to meet Agent Zayas.

Defendants appear to argue that the investigation began when the confidential informant began to fish for people who might know someone who had experience in home invasions at the bar (and consequently, that the government could not have known of any ongoing criminal activity on the part of the Defendants before "the investigation" began). However, as the government points out, there was no "investigation" until Curtis told the confidential informant that Simpson might be willing to help. Confidential informants are not prohibited from "fishing" for information as part of their job. Simpson, 813 F.2d at 1466 ("To win a suspect's confidence, an informant must make overtures of friendship and trust and must enjoy a great deal of freedom in deciding how best to establish a rapport with the suspect.").

Defendants further argue that, at best, once Agent Zayas was contacted by the criminal informant, all Agent Zayas knew about Simpson was that he had a crew, not that he was known to have participated in home invasions, prior to approaching him. (Dkt. #134 at 8). They also focus on Agent Zayas' lack of knowledge of the Defendants specific identities when Simpson was approached. However, as the government explains, at the initiation of such an investigation, law enforcement *cannot* know the identity of each person who has been committing the targeted crime – discovering their identities is often the whole point of the investigation. (Dkt.#128) The Ninth Circuit has explicitly rejected the notion that reasonable suspicion is required before agents can begin an undercover operation. United

States v. Garza-Juarez, 992 F.2d 896, 904 (9th Cir. 1993) ("In partially vacating the three-judge court's opinion, we follow four of our sister circuits in explicitly rejecting a 'reasoned grounds' requirement for investigation of an individual under the due process clause. . . . Therefore, any inability to state reasons for investigating Joe Juarez does not represent a constitutional violation."). In <u>Williams</u>, the Ninth Circuit explicitly rejected the argument that the government should have to show that it knew that the Defendants were involved in criminal activity *prior* to being approached by a confidential informant. 547 F.3d at 1200 ("Williams counters that the district court erred in looking to criminal activity committed by Williams *after* he met the confidential informant. This argument is unpersuasive. . . . Williams readily engaged in plans to buy and sell drugs with little or no encouragement from the government informants or agents.") (emphasis added); <u>see also</u> <u>United States v. Luttrell</u>, 923 F.2d 764 (9th Cir. 1991) (en banc) (rejecting notion that the government must have a reasoned ground to believe that a particular individual is engaged in or about to engage in criminal activities before being approached; "we follow four of our sister circuits in explicitly rejecting a 'reasoned grounds' requirement for investigation of an individual under the due process clause . . . [the] government need not have [a] reasonable suspicion of wrongdoing in order to conduct an undercover investigation"); <u>Citro</u>, 842 F.2d at 1150-51 (no evidence that police had any reason to suspect Citro of counterfeit credit card activity prior to confidential informant's approach); <u>Emmert</u>, 829 F.2d 805 (no outrageous government conduct despite trial court's finding that there was no evidence that Emmert or Powell had been involved in prior drug transactions before FBI approached and offered $200,000 finder's fee for securing cocaine supply for government agent).

Gurolla, 333 F.3d at 950, provides a useful analogy. In <u>Gurolla</u>, a money-laundering sting case, the Ninth Circuit explained that the government knew generally before it launched the sting that "Mexican banks were involved in money laundering, although it was not aware of the specific identity of all the participants." Here, the government was aware that home invasions are a major problem in Phoenix, although it was not aware of the specific identities of the Defendants when the confidential informant began "fishing" for a home invasion crew.

Moreover, even though Agent Zayas may not have known for certain whether Simpson in fact had a crew or had already undertaken other invasions, the undercover agent appears to have been told that Simpson may have been in a position to know someone who had done these things (or actually done it himself) based on what Curtis told the confidential informant. Simpson told the confidential informant that he had heard that Alexander had a crew that had already engaged in home invasions. While Simpson's credibility became severely strained while he was being cross-examined, at the time that the government was conducting the investigation, there was no reason for Agent Zayas to disbelieve what he was saying. It would be nonsensical for the outrageousness of the government's conduct to turn on challenges to the future credibility of their targets in a court proceeding that may or may not occur far into the future.

Requiring the government to prove that it knew that each Defendant involved in the sting operation had already engaged in a series of similar crimes before it was allowed to proceed or risk facing the penalty of having its conduct later be declared "outrageous" would likely cripple all future attempts to run undercover sting operations.[7] This factor is more reasonably interpreted by asking whether the government had a reasonable basis to believe that the individuals involved had prior similar criminal experience. Gurolla, 333 F.3d at 950 ("The standard [for outrageous government conduct] is not met when the government merely . . . approaches persons *it believes* to be already engaged in or planning to participate in the conspiracy . . . .") (emphasis added).

Here, Defendants' response and reactions created a reasonable basis for the government's belief that they had engaged in prior similar criminal activities. Simpson immediately came up with a plan to involve five men and gun power to take down the stash house. On the phone, he stated that he knew of a couple of crews who could do the robbery. Agent Zayas did not ask Simpson to bring anyone to him; rather, Simpson suggested that he

---

[7] No Ninth Circuit case appears to have discussed the burden of proof for establishing that the Defendant was already engaged in a series of prior similar crimes, and the parties have not addressed this issue in their briefing.

"knew people who would ride," meaning that he knew people who would help participate in the stash house robbery. He also stated that "Me and him did this . . . already . . . ." Black added that they could take a hostage and stated that he had done a stash house robbery before, explaining, "we've got this down to a science." Defendant Alexander specifically chose which other Defendants would be involved. His leadership and ability to get the other defendants to accept his direction suggests that perhaps some organization already existed, even if there does not appear to be any concrete proof of prior criminal activity. Alexander also asked Simpson if he knew any Mexicans with over 20 keys of cocaine. The other Defendants did not become targets of the investigation until they voluntarily accepted Simpson's invitations to meet with Agent Zayas and become involved with the stash house robbery. This factor thus ultimately points to finding that the government's behavior was not outrageous. See Emmert, 829 F.2d at 812.

### (2) The agent's participation was not necessary to enable the defendants to continue the criminal activity

Defendants argue that the informant and agent's participation were an integral part of the scheme (indeed, it was entirely their idea). (Dkt.#110 at 4-5) They assert that without the agent's encouragement and direction, the plan would never have gone forward, since the Defendants (a) would not have known about the fictitious stash house, (b) would not have known of the amount of drugs allegedly in the stash house, or (c) that the stash house would be guarded by two armed men. (Dkt.#134 at 9)

Defendants in their argument assume that the underlying crime is the robbery. It may be true that the robbery could not have occurred without the agent. However, the crime that Defendants are being charged with is *conspiracy*.[8] Theoretically, Defendants were capable of conspiring with each other to commit the robbery by taking overt steps to facilitate the

---

[8] Moreover, the government did not invent the concept of robbing a stash house. In a general sense, the criminal enterprise of robbing stash houses was already well underway in Phoenix before the government even began its investigation. See Michael Ferraresi and J.J. Hensley, Police Battle Wave of Abductions, Arizona Republic, Feb. 15, 2009 (attached as Exhibit A to the Government's Response Brief, Dkt.#128).

robbery even without the knowledge or participation of Agent Zayas. Indeed, Agent Zayas testified that he purposely held back from suggesting how to go about taking down the stash house or how many individuals should be involved. Here, at least one meeting occurred where the details of the robbery were planned without Agent Zayas or the confidential informant even being present.[9] The government provided the opportunity to rob the stash house. The Defendants were the ones who decided to take action, organize themselves, and figure out a plan and the various details to rob the stash house. Providing an opportunity for criminal activity is far beneath the threshold for outrageous government conduct. See Garza-Juarez, 992 F.2d at 905 (no due process violation even though the government "initiated all the contacts [with defendants,] raised the subject of illegal firearms and offered to supply the materials."); Citro, 842 F.2d at 1153 (government did not "create the criminal activity" even though it originally proposed the illegal scheme and provided the counterfeit credit cards).

The facts of Citro, 842 F.3d 1149, are instructive. Based on an inordinate amount of counterfeit credit card use in the Las Vegas area, the government hired a confidential informant to introduce undercover officers to merchants willing to accept counterfeit credit cards. After becoming friends with Citro, the undercover agent eventually raised the idea of a scheme involving counterfeit credit cards with collusive merchants and explained to Citro how such a scheme might operate. After a few dinners in which undercover agents posed as counterfeit credit card users, Citro called the agent and explained that he had lined up a jewelry store that would use the counterfeit credit cards in exchange for a two-thirds/one third split of the amount of money charged. The Ninth Circuit explained that "[w]hile it is true that the government supplied the counterfeit credit cards, and initially raised the idea of a counterfeit credit card scheme, . . . the government did not create the criminal activity. Visa, Mastercard, and Bank of America had identified an inordinate amount of counterfeit credit card use in the area. Citro, not the government, was the one who identified potential

---

[9] Although Simpson does present some credibility questions, the Court credits Simpson's statement that there was a meeting in which a number of Co-defendants were present to discuss the home invasion/robbery.

collusive merchants and made the necessary introductions." 842 F.2d at 1153.  Applying the same logic to the present case, the government did not create the existing home invasions in Phoenix.  Similarly, while the government posited the idea of this specific home invasion, Simpson, not the government, identified potential members of the crew and made the necessary introductions.

The Defendants all agreed to participate, without any apparent psychological or physical coercion on the part of the government.  Bonanno 852 F.2d at 437 ("Unacceptable governmental conduct occurs when the government agents act brutally by using physical or psychological coercion against the defendant, or the agents engineer and direct the criminal enterprise from start to finish.").  Nor did the government "engineer and direct the alleged criminal enterprise from start to finish."  Id.  The recorded conversations demonstrate that Black and Simpson asked about how the stash house was secured and came up with a plan to take down the stash house.  The additional Defendants were enlisted by Simpson and Alexander, not Agent Zayas.

This case is not one where the government supplied the necessary know-how, equipment, or expertise for carrying out the crime.  Instead, the government simply "attempted 'to attach itself to an on-going . . . operation for the purpose of closing it down and prosecuting the operators.'"  Citro, 842 F.2d at 1153 (internal citation omitted).  While Defendants focus on the fact that the "crew" would not have known where to go or whom to target without the participation of the undercover officer, it appears that the crew provided its own cars, manpower, weapons/firearms, and know-how in the attempt to take down the fictitious stash house.  Thus, this factor also points towards a finding of no outrageous government conduct.

### (3)    The agent used artifice and stratagem to ferret out criminal activity

As explained above, this factor demonstrates that the five-factor test is not a checklist, but a balancing test.  Obviously, government conduct would not "become" outrageous because an agent failed to use artifice and stratagem to ferret out criminal activity.  However,

this factor appears very connected to Defendants' arguments that the government acted outrageously in using an undercover agent to lure others into committing an "entirely made-up crime." (Dkt.#110 at 3)  Defendants argue that stratagem was not used to ferret out existing criminal activity, but to plant the seeds for future illegal activity. (Dkt.#110 at 4-5) The concept of governmental "luring," the fictional crime, and the fictitious quantity of drugs will therefore be addressed here.

"The courts have recognized that the government may use 'stealth and strategy' in fighting crime." Citro, 842 F.2d at 1153.  Here, the government targeted home invaders. Simpson made statements to the undercover agent to the effect that his crew had experience in such matters.  It was not unreasonable for the government to use artifice and stratagem in its attempt to ferret out criminal activity.  The fact that a Defendant may have been "lured" by the government into becoming involved with an undercover operation does not itself make the government's conduct outrageous.  See Garza-Juarez, 992 F.2d 896 (no due process violation although the government "initiated all contacts [with the defendants], raised the subject of illegal firearms and offered to supply the materials); Emmert, 829 F.2d at 811-12 (confidential informant's offer of $200,000 to college student in return for supplying the cocaine did not constitute outrageous conduct); Citro, 842 F.2d 1149 (no violation where undercover agent proposed details of counterfeit credit card scheme, supplied defendant with credit cards, and arrested defendant after he used them); United States v. Bagniariol, 665 F.2d 877 (9th Cir. 1981) (government conduct not outrageous where FBI agent posed as representative of a fictitious corporation to lure public officials into helping illegally promote certain legislation); United States v. Mayer, 503 F.3d 740, 754 (9th Cir. 2007) (implicitly approving of agents using fictional criminal activities to catch would-be perpetrators; "[l]ike the agent who bribed the legislator in Carpenter, Agent Hamer engaged in fictional criminal conduct and lied about being able to facilitate access for Mayer."); U.S. v. Brooks, 64 Fed. Appx. 641 (9th Cir. 2003) (no outrageous conduct given evidence of defendant's proactive and unhesitating involvement in the criminal scheme).  In fact, the Ninth Circuit recently explicitly approved of such sting operations:  "The government's decision to use a sting

operation to apprehend this group of criminals reduced the risk of violence to the public and is to be commended, not condemned. Though perhaps creative, the government's sting does not violate the universal sense of justice." Williams, 547 F.3d at 1201.

The facts of Emmert, 829 F.2d 805, demonstrate that governmental "luring" does not itself create an outrageous government conduct defense. While Emmert was an undergraduate at the University of California, San Diego, he became involved in a drug transaction after his friend and roommate Thomas Powell told him about a $200,000 finder's fee offered by Martin Mostellar, a confidential government informant, for locating a substantial supply of cocaine. After an initial attempt at a transaction that fell through because Emmert's friend suspected the police might be involved, Mosteller threatened Powell that he and Emmert had one week to make the sale they had previously discussed "or else." However, he did not make good on this threat and negotiations between the parties continued. The sale was finally consummated and Emmert was arrested. The Ninth Circuit rejected Emmert's argument that the governmental coercion was outrageous, explaining that the threat to complete the sale "or else" was merely bluster, or an "ordinary bargaining tactic in drug deals." 829 F.2d at 812. The $200,000 finder's fee was likewise deemed not outrageous, but "necessary to create a credible cover for undercover agents" and "not intended as bait for college students, but as a method to smoke out a supplier capable of selling large quantities of cocaine." Id. As applied to the present case, the drugs in the stash house were similarly not designed to bait individuals who otherwise would have no desire to engage in criminal activity, but to create a credible cover story to smoke out home invaders with similar prior experience in stash house robberies.

The Ninth Circuit also rejected Emmert's argument that the government's fabrication of the crime was outrageous: "In this case, the government was on only one side of the transaction: Powell and Emmert independently arranged the cocaine supply from co-defendant Cioe. The government did not fabricate the crime in this case." Id. at 813. Using the same analysis, even though the government technically proposed the idea of the illegal activity, it was the Defendants' steps that (if proved at trial) would create the crime of

conspiracy.  As such, the government did not "fabricate" the crime merely by suggesting that a stash house robbery was possible.

Nor does it appear that the fictitious nature of the crime or the fictitious quantity of the drugs would compel a finding of outrageous government conduct in any case. Defendants focus specifically on the fact that the fictitious quantity of drugs chosen by the informant "just happens to have a mandatory minimum sentence [of] ten years."  (Dkt.#110 at 3)  Defendants never address the many cases cited by the government that suggest that using a stash house robbery sting involving fictional quantities of drugs to lure and catch home invaders appears to be a relatively common police practice: United States v. Rodriguez, 360 F.3d 949, 960 (9th Cir. 2004) (drug trafficking convictions affirmed where defendants agreed to "conduct a fictitious raid of the stash house" where they would steal approximately 25 kilograms of cocaine"); United States v. Sanchez, 138 F.3d 1410, 1412 (11th Cir. 1998) (finding no outrageous conduct where government "creat[ed] a fictitious crime for [defendants] to commit – robbery of a non-existent house allegedly stocked with large quantities of cocaine and marijuana, which did not exist"); United States v. Corson, 579 F.3d 804, 806 (7th Cir. 2009) (drug trafficking convictions affirmed where there "never was any stash house to rob," fictitious drug amount was "15 to 20 kilograms of cocaine," and undercover agent suggested the use of a gun).  (Dkt.#128 at 5)

To dismiss a claim for outrageous government conduct, the conduct must be "so shocking to due process values" that any other outcome would be unacceptable.  Williams, 547 F.3d at 1199.  The abundance of other cases in which reverse-sting operations were found to be acceptable greatly undermines Defendants' arguments that the government's conduct was "outrageous."

Agent Zayas testified that the actions taken by the government were designed to ensure that the crew was aware of the risks of the home invasion and was given the opportunity to leave.  (Dkt.#128 at 3) There is no evidence that at any point the government applied physical or psychological pressure to Defendants to attempt to coerce them into participating.  Bonanno, 852 F.2d at 437 ("Unacceptable governmental conduct occurs when

- 23 -

the government agents act brutally by using physical or psychological coercion against the defendant, or the agents engineer and direct the criminal enterprise from start to finish."). Because nothing about the "luring," the fictitious crime, or the fictitious quantity of drugs rises to the level of coercion involved in <u>Greene</u>, the one Ninth Circuit case where outrageous government conduct was found, this factor also points toward a finding of no outrageous government conduct. <u>Greene</u>, 454 F.2d 783 (reversing conviction for owning and operating a still when government offered to supply the raw materials, an operator, and the location of the still, acted as the still's sole customer, and made veiled threats to the Defendant to induce him to keep the still operational).

**(4)    The agent infiltrated a criminal organization**

Defendants argue that there was no existing organization to infiltrate; rather, most of the men had just met. (Dkt.#110 at 4-5)  They further argue that the organization was formed in response to the government's inquiry.

It remains unclear whether Defendant Alexander in fact had a crew that regularly conducted home invasions, or whether he organized this specific crew solely for the purpose of conducting this robbery.  Defendant Simpson testified that he thought that Defendant Alexander operated a crew and that he had already engaged in five prior home invasions; he also said "we've done this . . . before . . . ."  However, Defendant Simpson contradicted himself several times while testifying, in general, but also specifically as to this very topic. It appears that Simpson and Black were friends, and that they enlisted the help of Defendant Alexander and Defendant Alexander's friends or associates (making up the rest of the Defendants).  However, there is insufficient evidence to conclude that the two groups ever acted together on any prior home invasion, and it is not clear from the evidence presented to the court whether Defendant Alexander's associates had ever acted together in prior home invasions.

Notwithstanding these facts, however, it appears from the recorded conversations that Simpson caused the government to believe that he had a "couple of crews" who could do the job.  Simpson may have been referring to "Mac's crew," another group of individuals who

declined to participate in the stash house robbery, and to Alexander's crew. Agent Zayas testified that on the July 27, 2009 meeting, Alexander appeared to be the group's leader, not Simpson. However, at no point was there testimony that Agent Zayas or the government had any reason to believe that Simpson was not part of Alexander's crew prior to the date of the proposed robbery. Thus, the government appears to have been acting reasonably, if mistakenly, in believing that it had infiltrated an existing criminal organization, even if in reality, the organization appears to have been formed in response to the opportunity Agent Zayas presented to Simpson. This factor therefore also weighs against finding that the government acted outrageously. Even if the men had just met, as they allege, it was not unreasonable for the government to rely on Simpson's statements to the effect that the crew had experience working together.

### (5) The agent approached persons already contemplating or engaged in criminal activity.

Defendants argue that there was no evidence that they were already contemplating or engaged in criminal activity prior to the agent's approach. (Dkt. #134 at 11) As explained above, Agent Zayas approached Simpson after Curtis told the confidential informant that Simpson would be willing to engage in illegal activities. Though the other Defendants became targets as they were recruited by Simpson and agreed to participate, the government never approached the other individuals directly (or independently) of Simpson. Because the government approached only Simpson, and Simpson explained that he indeed had been involved in prior home invasions, and that he knew others who would also be willing to get involved, this factor likewise points toward a finding of no outrageous government conduct. The nature of undercover operations is exploratory and unique. The fact that some of the Defendants may not in fact have been involved in any prior criminal activity, let alone similar prior criminal activity, in this circumstance is relevant but not compelling. They became willing participants when they were approached by Simpson. The government approached only Simpson, and reasonably relied on Simpson's assertion that he "had a crew" and that they had done this before. Gurolla, 333 F.3d at 950 ("The standard [for outrageous

government conduct] is not met when the government merely . . . approaches persons *it believes* to be already engaged in or planning to participate in the conspiracy . . . .") (emphasis added).

Here, the Phoenix area has been plagued with violent home invasions due to drug trafficking. The ATF utilized a confidential informant to assist in developing leads regarding those who might be participating in these crimes. The confidential informant told Agent Zayas that he had identified an individual who indicated that he was interested in committing such a crime. The undercover agent met with this individual who introduced him to others who also directly communicated or otherwise indicated that they would be willing participants in a stash house robbery. Defendants Alexander and Black came up with a plan and recruited a number of individuals to assist in the plan's execution. All of these individuals (except for Simpson) were arrested with a number of firearms the day of the purported robbery. On balance, the government appears to have acted reasonably. The conduct of the government in this case was plainly not so egregious as to shock the "universal sense of justice" that would require a dismissal based on outrageous government conduct. Smith, 924 F.2d at 897.

**Accordingly,**

**IT IS HEREBY ORDERED** denying Defendants' motions to dismiss based on outrageous government conduct (Dkt.#s 110, 134).

DATED this 20th day of April, 2010.

Mary H. Murgula
United States District Judge